**NON-CONFIDENTIAL VERSION**

**2022-2078**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**UNITED STATES STEEL CORPORATION,**
*Plaintiff-Appellant*

**NUCOR CORPORATION,**
*Plaintiff*

**v.**

**UNITED STATES, BLUESCOPE STEEL (AIS) PTY LTD., BLUESCOPE STEEL LTD, BLUESCOPE STEEL AMERICAS, INC.,**
*Defendants-Appellees.*

Appeal from United States Court of International Trade
Court Nos. 1:20-cv-03815-JCG, Judge Richard K. Eaton

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES BLUESCOPE STEEL (AIS) PTY LTD., BLUESCOPE STEEL LTD, BLUESCOPE STEEL AMERICAS, INC.**

Daniel L. Porter
Christopher Dunn
James P. Durling
James C. Beaty

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

January 25, 2023          *Counsel for Defendants-Appellees*

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-2078 |
| **Short Case Caption** | United States Steel Corporation v. US |
| **Filing Party/Entity** | BlueScope Steel (AIS) Pty Ltd.; BlueScope Steel Limited; BlueScope Steel Americas, Inc. |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 1/25/2023

Signature: /s/ Daniel L. Porter

Name: Daniel L. Porter

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| BlueScope Steel. (AIS) Pty Ltd. | | BlueScope Steel Limited |
| BlueScope Steel Limited | | |
| BlueScope Steel Americas, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF CONFIDENTIAL INFORMATION ...........................................1

STATEMENT OF RELATED CASES ...................................................2

STATEMENT OF THE ISSUES..........................................................2

STATEMENT OF THE CASE............................................................2

SUMMARY OF THE ARGUMENT ....................................................4

STATEMENT OF FACTS ................................................................6

STANDARD OF REVIEW ...............................................................11

I.    COMMERCE CORRECTLY DETERMINED THAT
      SUBSTANTIAL EVIDENCE DEMONSTRATES THAT
      BLUESCOPE DID NOT REIMBURSE ITS AFFILIATED
      IMPORTER BSA FOR PAYMENT OF ANTIDUMPING DUTIES ..........13

      A.    Commerce Correctly Determined That The Facts That BSA
            Paid The Requisite Amount of Antidumping Duties And That
            BSA Certified Non-Reimbursement For The Very Sales At
            Issue Constituted Substantial Evidence That There Was No
            Reimbursement.................................................................13

      B.    Commerce Correctly Rejected U.S. Steel's  Claim That BSA
            Was "Indirectly" Reimbursed Through The Substrate Supply
            Agreement ......................................................................15

      C.    Commerce Also Correctly Concluded That The Evidentiary
            Record Did Not Demonstrate That AIS "Lowered" Its Price To
            BSA To Account For AD Duties That BSA Paid ..............................18

      D.    Commerce Correctly Found That The "Mill Price" That AIS
            Charged BSA Was For the Purpose of Determining Entered
            Value...............................................................................21

II.   COMMERCE PROPERLY APPLIED ITS REGULATION WHEN
      DETERMINING THAT BLUESCOPE HAD NOT REIMBURSED
      ITS IMPORTER FOR DUMPING DUTIES .................................................24

CONCLUSION ....................................................................................................31

## Confidential Material Omitted

The material omitted on page 10 describes particular terms of the sales agreement, the material on page 19 describes the step by step transfer price methodology as well as specific invoice numbers, descriptions, and prices.

# TABLE OF AUTHORITIES

**Cases**

*Apex Exps. v. United States*,
   777 F.3d 1373 (Fed. Cir. 2015) ...........................................................30

*Aqua Prods. v. Matal*,
   872 F.3d 1290 (Fed. Cir. 2017) ...........................................................13

*Auer v. Robbins*,
   519 U.S. 410 (1945) ...........................................................................13

*Consolidated Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ...........................................................................12

*Deacero S.A.P.I. De C.V. v. United States*,
   996 F.3d 1283  (Fed. Cir. 2021) ..........................................................12

*Hoogovens Staal BV. United States*,
   4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998)............................................30

*Jiaxing Brother Fastener Co. v. United States*,
   822 F.3d 1289  (Fed. Cir. 2016) ..........................................................12

*Kisor v. Wilkie*,
   588 U.S. __,139 S. Ct. 2400 (2019) ....................................................13

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004) ...........................................................12

*Torrington Co. v. United States*,
   881 F. Supp. 622  (Ct. Int'l Trade 1995).........................................28, 29

*United States Steel Corp. v. United States*,
   578 F. Supp. 3d 1323 (Ct. Int'l Trade 2022)................................. passim

*United Steel & Fasteners, Inc. v. United States*,
   947 F.3d 794 (Fed. Cir. 2020) .............................................................13

**Regulations**

19 C.F.R. § 351.402(f)......................................................................2, 15

**Administrative Decisions**

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews*, 57 Fed. Reg. 28,360 (June 24, 1992)..................................................................29

*Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 Fed. Reg. 40,848 (July 11, 2012) ..................................................................28

*Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Review, and Revocation of Order (in Part); 2011-2012*, 78 Fed. Reg. 42,497 (July 16, 2013).....................28

*Certain Hot-Rolled Steel Flat Products From Australia: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 63,249 (Oct. 7, 2020) ........................................................................3

## STATEMENT OF CONFIDENTIAL INFORMATION

Pursuant to Federal Circuit Rule 28(d), Defendants–Appellees, the BlueScope entities,[1] state that their Response Brief contains certain confidential business proprietary information protected by Administrative Protective Order in the underlying agency proceeding.  Such confidential business proprietary information ("BPI") consists of information contained in business proprietary documents and data provided by BlueScope to Commerce.  During the underlying proceeding, Commerce accepted the BPI designation and accorded confidential treatment to the BPI.

Accordingly, confidential information has been redacted from the following pages of the non-confidential version of this Response Brief: 10 and 19.

Finally, pursuant to Federal Rule of Appellate Procedure 25(c)(2) and with U.S. Steel's counsel written consent, and the Government counsel's written consent, the confidential version of this Response Brief has been served via secured electronic delivery.

---

[1] The term "BlueScope" is used to refer to the combined entity comprising those affiliates that constituted the "interested party" that responded to Commerce's questionnaires in the underlying administrative proceeding i.e. BlueScope Steel (AIS) Pty Ltd., BlueScope Steel Ltd, and BlueScope Steel Americas, Inc.

## STATEMENT OF RELATED CASES

BlueScope knows of no additional cases within the meaning of related case under Fed. Cir. Rule 47.5.

With respect to U.S. Steel's observation that the appeal of the third administrative review would be controlled by the outcome of this case, BlueScope notes that the arguments advanced in U.S. Steel's brief have been rejected five previous times -- twice by the Court of International Trade (the "Trade Court") and three times by the agency, the U.S. Department of Commerce ("Commerce").

## STATEMENT OF THE ISSUES

The sole issue before this Court is whether Commerce's final determination that there was no antidumping duty reimbursement within the meaning of 19 C.F.R. §351.402(f) was supported by substantial evidence.

## STATEMENT OF THE CASE

This appeal does not represent any true question of law. Rather, this appeal represents a Hail Mary attempt by Plaintiff-Appellant, U.S. Steel, to have this Court overturn the careful examination of the evidentiary record by both Commerce and the Trade Court. That record was the factual basis for Commerce's conclusions that there was no evidence of unlawful antidumping reimbursement by BlueScope and therefore there was no justification to undertake the reimbursement adjustment as advocated by U.S. Steel.

BlueScope is comprised of a foreign producer exporter, BlueScope Steel (AIS) Pty Ltd. ("AIS"), the ultimate corporate parent company BlueScope Steel Ltd ("BSL"), and the affiliated U.S. importer BlueScope Steel Americas, Inc. ("BSA"). BlueScope is the only hot-rolled steel producer in Australia. BlueScope fully participated in Commerce's original antidumping investigation as well as in each subsequent antidumping administrative review.

Before this Court is Commerce's final antidumping administrative review determination for the second period of review, October 1, 2017 – September 30, 2018 (referred to as "POR2"). Commerce published its final determination on October 7, 2020 and assigned BlueScope an antidumping duty rate of 2.72 percent. *Certain Hot-Rolled Steel Flat Products From Australia: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 63,249, 63,250 (Oct. 7, 2020), Appx0035. In doing so, Commerce rejected U.S. Steel's arguments that Commerce should dramatically increase this antidumping rate by deducting from BlueScope's U.S. sales price the amount of antidumping duties BlueScope had already paid. Commerce concluded that the evidentiary record did not support a finding of antidumping reimbursement and there was therefore no justification to undertake the sales price adjustment sought by U.S. Steel.

# SUMMARY OF THE ARGUMENT

U.S. Steel's case rests on a fundamentally distorted view of the facts.  U.S. Steel claims that Commerce was wrong to conclude the administrative record did not support a finding that the foreign producer AIS had "reimbursed" its related-party importer, BSA, for the amount of antidumping duties that BSA had paid on the import entries of the subject merchandise.  U.S. Steel's argument, however, rests on an incorrect understanding of the evidentiary record.  Commerce correctly analyzed the evidentiary record and rejected U.S. Steel's argument.

Commerce correctly determined that the combination of the facts that (1) BSA paid the requisite amount of antidumping duties and (2) BSA's certification of non-reimbursement submitted to Customs for the very sales at issue together constituted important evidence that there was no reimbursement.  U.S. Steel's argument largely ignores this important evidence that was at the heart of the Commerce determination at issue here.

Commerce also correctly rejected U.S. Steel's  claim that BSA was "indirectly" reimbursed through the formula price provisions set forth in the Substrate Supply Agreement.  The administrative record shows that the "formula price" does not establish the invoice price that exporter AIS is to charge importer BSA.  Rather, the formula price under the Supply Agreement is the price *that BSA is to charge the related end customer, Steelscape*, for the merchandise.  In fact,

nothing in the Substrate Supply Agreement sets forth the invoice price that foreign producer AIS is to charge its related party importer BSA for the merchandise. AIS cannot have "lowered" an invoice price when that invoice price is nowhere set forth in the relevant agreements between the parties.

Commerce also correctly concluded that the evidentiary record did not demonstrate that AIS "lowered" its price to BSA to account for the antidumping duties that BSA had paid. U.S. Steel's brief conveys the impression there was certain record evidence not appropriately considered by Commerce, repeatedly referencing a calculation worksheet that BlueScope submitted to Commerce in response to a specific question by Commerce concerning the calculation of its transfer prices. This impression, however, is just wrong. Commerce explicitly addressed this specific BlueScope calculation worksheet in its final determination and concluded that BlueScope's calculation of its transfer prices "provides no evidence that AIS reimbursed BSA for AD duties." Final IDM at 8, Appx0026.

The record shows that AIS did not charge BSA for the duties that BSA deposited with Customs upon entry of the merchandise. Doing so would have BSA pay the duties twice – once to Customs and once to AIS. But both Commerce and the Trade Court understood that BlueScope took this approach to comply with the definition of "entered" value as that term is defined by Customs, and this approach, not to pay the duties twice, did not constitute reimbursement.

The end of the U.S. Steel brief also raises a legal argument that Commerce improperly applied its regulation on reimbursement of dumping duties when it found no reimbursement in this case. This argument, however, fundamentally misstates what Commerce did. Commerce did not find that its regulation applies only to direct reimbursement of dumping duties and cannot encompass indirect reimbursement of duties through the lowering of an invoice price. On the contrary, Commerce found that since there was no lowering of the formula price to the importer (the importer paid a price that included the duties paid by BSA), in this particular case there was no reimbursement of duties, direct or indirect. Commerce's determination reflected a careful and correct review of the record before it; it was not based on the distorted view of the record presented by U.S. Steel.

Commerce's finding of no reimbursement was correct both as a matter of fact and as a matter of law. The Trade Court decision upholding Commerce's finding should be affirmed.

## STATEMENT OF FACTS

BlueScope understands that the Federal Circuit Court does not normally require responding parties to restate the facts set forth in the other side's opening brief. In this case, however, U.S. Steel has omitted or mischaracterized a number of critical facts. Therefore, it is essential that the facts of the case be stated clearly

and accurately so that the Court may have a proper understanding of the issue before it.

We begin with the entities that comprise BlueScope. BlueScope Steel ("BSL") is the ultimate corporate parent. BlueScope Steel (AIS) Pty. Ltd. ("AIS") is an Australian producer-exporter of hot-rolled steel subject to Commerce's antidumping duty order against Australia. Vis-à-vis U.S. exports, AIS produces, sells, and ships that hot-rolled steel to its affiliate Steelscape LLC ("Steelscape"), a Washington State manufacturer of cold-rolled and galvanized steel in which BSL has a controlling 50 percent interest. In making those sales, AIS first invoices the related importer U.S. subsidiary, BlueScope Steel Americas, Inc. ("BSA"), and in a back-to-back transaction BSA then invoices the ultimate customer Steelscape. The sales process among the four parties can be diagrammed as follows:

## BlueScope US Sales Process[2]



[2] *See* Section A QR at 26-27, Appx0097-0098; *see also* Supplemental Section A QR at 6-10, Appx1436-1440.

A description of the sales process was placed on the administrative record before Commerce in BlueScope's initial Section A Response. *See* Section A QR at 26-27 (describing BlueScope's sales process), Appx0097-0098. A similar version of the above schematic illustrating that process was prepared for BlueScope's response brief submitted to the Trade Court and summarized in that decision. *United States Steel Corp. v. United States*, 578 F. Supp. 3d 1323, 1325 (Ct. Int'l Trade 2022) ("*United States Steel Corp.*"). It is important to understand that the essence of the transaction is between BSL and Steelscape, through AIS and BSA as intermediary parties. U.S. Steel continually emphasizes just the AIS-BSA intermediate portion of the transaction, while ignoring the record evidence that emphasizes the complete nature of the overall BSL-Steelscape sale among all the parties.

We now turn to the prices being charged by these parties. The price of the steel that BSL charges the ultimate affiliated customer Steelscape (through BSA) is established by a Substrate Supply Agreement (the "Supply Agreement") among BSL, BSA, and Steelscape. This agreement was placed on the record before Commerce and was reviewed by the Trade Court. Supplemental Section A Response at Ex. SA-11, Appx2065-2108; *United States Steel Corp.*, 578 F. Supp. 3d at 1325-26. The Agreement sets the price that *BSA charges Steelscape* for the merchandise, according to a formula using two published hot-rolled price indices.

CONFIDENTIAL MATERIAL OMITTED

Article 5.1 of the Supply Agreement uses this formula to determine the price of the purchase order ("PO") that Steelscape submits to BSA. Supplemental Section A Response at Ex. SA-11, Appx2078. Article 3.5 of the Supply Agreement states that "Steelscape will submit two POs {purchase orders} to BSA for the total amount of HRC {hot-rolled coil} in the Steelscape Order for each supply month…" *Id.*, Appx2077. Article 6.1 of the Agreement further sets forth invoice the price that "BSA will provide to Steelscape." *Id.*, Appx2079. That price is a delivered, duty-paid price -- a price that includes both the duties and the cost of delivering the merchandise to Steelscape.

Commerce correctly understood that the price set forth in the Supply Agreement was the price to be charged to Steelscape, not any price between BSL (AIS) and BSA. Final IDM at 8, Appx0026. The Trade Court also correctly understood that "the Supply Agreement identifies that price that the Importer {BSA} charged Steelscape." *United States Steel Corp.*, 578 F. Supp. 3d at 1325 n.2. The Trade Court added that the price was a [     delivery terms     ], and that "Steelscape was charged a duty-inclusive price." Confidential Slip Op. 22-57 at 4, n.2, Appx0005  The Trade Court further noted that the importer paid the requisite duties and certified that it was not reimbursed by the manufacturer, producer, seller or exporter of all or any part of the antidumping duties." Confidential Slip Op. 22-57, at 5-6, nn. 2, 3, Appx0005-0006. Hence, U.S. Steel's

claims that "the terms of BlueScope's supply agreement establish that the importer is to be invoiced a formula price for HRS," U.S. Steel's Br. at 6, are flatly contradicted by the record.

The Trade Court, reviewing the record before it, correctly concluded that the price AIS charged the importer BSA was determined "by reference to the downstream, duty-inclusive price charged to the Importer's U.S. customer Steelscape, pursuant to the terms of the supply agreement." *United States Steel Corp.*, 578 F. Supp. 3d at 1330. The Trade Court also correctly noted that there was "no evidence" that BSA, the importer, was reimbursed directly or indirectly by the exporter for the estimated duties that BSA deposited with U.S. Customs upon entry. On the contrary, the Trade Court cited Commerce's determination that BSA submitted a certificate of non-reimbursement, paid the duties on the imports, and fully "passed these duties on to Steelscape as part of the transfer price" it charged Steelscape. *United States Steel Corp.*, 578 F. Supp. 3d at 1331. The Trade Court therefore correctly concluded that Commerce's determination of non-reimbursement was both reasonable and fully supported by the facts of record.

## STANDARD OF REVIEW

As U.S. Steel's claim is largely one of fact, the standard of review for this Court is whether Commerce's determination is supported by substantial evidence on the record. U.S. Steel Br. at 7-8. Substantial evidence means "more than a

mere scintilla," meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). U.S. Steel's brief fails to note, however, that in the context of antidumping proceedings, this Court "accords particular deference" to Commerce's review of the facts before it. *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004); *see also Deacero S.A.P.I. De C.V. v. United States*, 996 F.3d 1283, 1301 (Fed. Cir. 2021) (declining a petitioner argument that the evidence "it presented to Commerce concerning what it considered a more appropriate AFA rate."); *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1298-1302 (Fed. Cir. 2016) (affirming various surrogate value selections made by Commerce).

Commerce is also the "master of the dumping law," and its decisions on matters of fact are entitled to great weight. U.S. Steel attempts to construct an argument relating to Commerce's application of its regulation concerning reimbursement of dumping duties. Although that argument is actually based on a mistake of fact, if this Court determined that the argument was one of law, the standard would be whether Commerce's interpretation of the regulation was "reasonable," that is, based on a permissible construction of the regulation. As the Supreme Court has recently reaffirmed, "a court should defer to the agency's construction of its own regulation." *Kisor v. Wilkie*, 588 U.S. __,139 S. Ct. 2400,

2411 (2019) (*citing Auer v. Robbins*, 519 U.S. 410 (1945)).  This Court has acknowledged that the *Auer* doctrine guides its analysis in certain situations where the agency is interpretating its own regulations.  *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794 (Fed. Cir. 2020) (considering the applicability of the *Auer* doctrine to Commerce's regulatory interpretation);  *see also Aqua Prods. v. Matal*, 872 F.3d 1290, 1263 (Fed. Cir. 2017) (invoking the *Auer* doctrine in its discussion of the burden of proof).

I.   **COMMERCE CORRECTLY DETERMINED THAT SUBSTANTIAL EVIDENCE DEMONSTRATES THAT BLUESCOPE DID NOT REIMBURSE ITS AFFILIATED IMPORTER BSA FOR PAYMENT OF ANTIDUMPING DUTIES**

  A.   **Commerce Correctly Determined That The Facts That BSA Paid The Requisite Amount of Antidumping Duties And That BSA Certified Non-Reimbursement For The Very Sales At Issue Constituted Substantial Evidence That There Was No Reimbursement**

There is no dispute that BSA, BlueScope's affiliated U.S. importer, properly paid to U.S. Customs the antidumping duties owed for all sales transactions at issue in the antidumping review.  Commerce's Decision Memorandum explicitly notes this undisputed fact.  *See* Final IDM at 7, Appx0025.

The administrative record also makes clear that, as part of its normal course of business for importing, BSA submitted a "certificate of non-reimbursement" for those import entries upon which Commerce based its determination.  Section A Response at Ex. A-8b, Appx0239.  This document states, in pertinent part, that

BlueScope "has not entered into any agreement or understanding for the payment or for the refunding . . . of all or any party of the antidumping duties." *Id.* Commerce expressly relied on this evidence, stating "BSA filed the requisite certifications when it imported subject merchandise purchased from AIS." Final IDM at 7, Appx0025. Commerce went on to observe that "there is no record evidence to contradict BSA's statements in these certifications. In contrast, BlueScope submitted record evidence which supports these statements." *Id.* Importantly, Commerce also observed that BSA had actually paid the duties. *Id.*

The Trade Court also considered this evidence important to Commerce's decision stating that BlueScope's pricing methodology was "unremarkable when viewed in the context of the record." *United States Steel Corp.*, 578 F. Supp. 3d at 1331. The Trade Court concluded that "{t}ogether with the non-reimbursement evidence in the form of the certificate filed by the Importer, and evidence that the Importer paid duties owed on the subject steel… it was not unreasonable for Commerce to find that the reimbursement regulation did not apply." *Id*.

U.S. Steel's opening brief provides nothing to address these key pieces of evidence. Instead, U.S. Steel implicitly asks this Court to ignore that evidence. Indeed, U.S. Steel itself completely ignores the important non-reimbursement certification referring to it only in a parenthetical quote of the Trade Court's decision. U.S. Steel Br. at 13.

It is clear from Commerce's determination, the Trade Court's opinion, and the relevant regulations that non-reimbursement certificates are important documents in considering this type of issue. 19 C.F.R. §351.402(f) states that a failure to file such a certificate may result in a presumption that reimbursement has occurred. 19 C.F.R. §351.402(f)(3). Likewise, the submission of the certification creates a presumption that there has not been any reimbursement. Here, it is undisputed that the importer BSA filed the requisite certification when it made import entries subject to Commerce's review, the non-reimbursement certificate was included in the record of the administrative action subject to this appeal, and Commerce relied on the document in making its determination. U.S. Steel points to no part of the record that would undermine the assertions made in that certification and thus its argument fails to account for a key part of Commerce's actual decision.

### B. Commerce Correctly Rejected U.S. Steel's Claim That BSA Was "Indirectly" Reimbursed Through The Substrate Supply Agreement

Lacking any evidence that BSA was actually reimbursed for the duties, U.S. Steel's argues that AIS somehow "indirectly" reimbursed BSA by "lowering" its price to BSA by the amount of duties that BSA paid. This entire argument, however, comes from a false premise; namely, that the Steelscape Substrate Supply Agreement somehow establishes that "the *importer* is to be invoiced a formula

price for HRS." U.S. Steel Br. at 6 (emphasis supplied). Indeed, U.S. Steel's Brief

makes clear that its argument is based on the following factual predicates:

> "The terms of the supply agreement dictate that BlueScope will
> charge its importer for HRS an amount calculated by a pricing
> formula." (U.S. Steel's Brief at 9)

> "BlueScope's supply agreement provides a two-step formula for
> calculating the price of HRS to the importer." (U.S. Steel's Brief at
> 10)

> "BlueScope did not charge its importer for the formula price for the
> imported HRS." (U.S. Steel's Brief at 10)

But these factual statements are just not true. Indeed, they are directly contradicted

by the Supply Agreement itself, as both Commerce and the Trade Court concluded.

The administrative record demonstrates that the formula price set forth in the

Substrate Supply Agreement is *only* the price that BSA must charge *Steelscape*, the

BlueScope affiliate that purchases the steel from BSA. An examination of relevant

clauses of the Supply Agreement confirms this point.

The Supply Agreement, as noted earlier, is an agreement among between

BSL (through AIS), BSA and Steelscape. Supplemental Section A Response at

Ex. SA-11, Appx2065-2108. Article 5.1 sets forth the "formula price" as "the base

price per tonne of the HRC supplied under each PO" using a ratio of two published

price indices. The Agreement defines the term "PO" to mean "purchase order."

The only purchase orders detailed in the Agreement are two purchase orders that

"*Steelscape will submit…to BSA* for the total amount of HRC {hot-rolled coil} in

- 16 -

the Steelscape Order….” *Id.*, Appx2077.  These purchase orders are described in detail in Article 3.5 of the Agreement.  The Agreement makes no mention of any purchase order between BSA and the exporter, AIS.  Hence, the “formula price” set forth under the Agreement is solely the price that BSA charges *Steelscape*.

Both Commerce and the Trade Court understood the actual pricing arrangement set forth in the Supply Agreement quite well.  Commerce’s Final Analysis Memorandum stated that “these parties have a long-standing supply agreement which sets the transfer price of subject merchandise *to Steelscape* according to a formula.”  Final Analysis Memo at 4, Appx4103 (emphasis supplied); *see also* Final IDM at 8, Appx0026.  The Trade Court, examining the Supply Agreement for itself, agreed that “the Supply Agreement identifies the price that the Importer charged Steelscape…” *United States Steel Corp.*, 578 F. Supp. 3d at 1325, n.2.

Consequently, although U.S. Steel claims that Commerce “disregarded the terms of the pricing arrangement {set forth in the Supply Agreement},” U.S. Steel Br. at 9, and that “the invoice price to BlueScope’s importer…should have equaled the value calculated by the supply agreement formula,” U.S. Steel Br. at 14, it is U.S. Steel that has completely disregarded the actual terms of the supply agreement.  It is U.S. Steel, not Commerce that is ignoring the key record evidence on this issue.

**C.     Commerce Also Correctly Concluded That The Evidentiary Record Did Not Demonstrate That AIS "Lowered" Its Price To BSA To Account For AD Duties That BSA Paid**

U.S. Steel further claims that "Commerce, Defendant-Appellees and the Trade Court all agree that the exporter (BlueScope) *reduced* the price of the HRS to its affiliated importer explicitly to account for dumping duties that otherwise would have been owed by the importer upon entry." U.S. Steel Br. at 8 (emphasis supplied). However, again, this claim is wrong and is not supported by the record evidence.

At the outset we note that U.S. Steel conveys the impression that U.S. Steel has identified certain record evidence not appropriately considered by Commerce. U.S. Steel's brief repeatedly references a calculation worksheet that BlueScope prepared for and submitted to Commerce in response to a specific question by Commerce concerning the calculation of its transfer prices. *See* U.S. Steel Br. at *passim* (citing Supplemental Section A Response at Ex. SA-12, Appx2110-2134).

Such impression, however, is not correct. Commerce explicitly addressed this very BlueScope exhibit in its final decision papers. Specifically, Commerce's Decision Memorandum stated:

> BlueScope  . .. demonstrated its methodology for calculating these transfer prices, as well as the transfer prices between AIS (the producer/exporter) and BSA. In the Final Analysis Memorandum, we discuss BlueScope's transfer price methodology, and we find that this methodology provides no evidence that AIS reimbursed BSA for AD duties.

**CONFIDENTIAL MATERIAL OMITTED**

Final IDM at 8, Appx0026 (emphasis supplied). The transfer pricing worksheet

was expressly considered by Commerce.  Commerce's Final Analysis

Memorandum then painstakingly summarized BlueScope's approach to

determining its transfer prices.  That document explains:

**BlueScope's Transfer Price Methodology**

> BlueScope demonstrated its transfer price methodology in its
> questionnaire responses{*citing* Exhibit SA-12 to BlueScope's April 8,
> 2019 Supplemental Section A Questionnaire Response}.  [
>
> description of price methodology
>
>                                                                    ]. In other
> words, BSA paid the requisite dumping duties (an amount calculated
> using the [   delivery terms      ] price), and Steelscape was charged a
> duty-inclusive price.
>
> Using invoice [invoice pwo dgt ] as an example, BlueScope first
> calculated Steelscape's transfer price using the formula price of the
> SSB and CRU steel indices ($[amount ]/MT) and then it adjusted that
> base price according to product characteristics to arrive at $[amount
> ]/MT.[9] This base price, plus adjustments, is the price that BSA charged
> Steelscape.  Then, BlueScope [
>           description and dollar amount                        ]/MT.
> Finally, BlueScope [      description and dollar amount
>          ]/MT, to arrive at the $[amount ]/MT entered value, upon
> which BSA paid its cash deposit of antidumping duties.  Finally,
> BlueScope calculated its transfer price to BSA by [
>          description and dollar amount        ], resulting in a $[ amount
> ] transfer price to BSA.

Final Analysis Memo at 4, Appx4103 (internal citations omitted).  In this

discussion, Commerce twice specifically noted that BlueScope "deducted

estimated" antidumping duties when explaining the manner in which BlueScope set the transfer price for entered value.

As demonstrated above, Commerce fully analyzed and understood the record evidence concerning BlueScope's actual calculation of its transfer prices for its U.S. exports of subject merchandise. Contrary to U.S. Steel's argument, Commerce did not overlook that BlueScope took into account antidumping duties that BSA would have to pay when establishing the entered value. Commerce expressly noted this fact in its discussion, but concluded this fact and the transfer pricing methodology more generally did not establish evidence of reimbursement.

Based on its detailed examination and analysis Commerce concluded that BlueScope's calculation of its transfer prices "provides no evidence that AIS reimbursed BSA for AD duties." Final I&D Memorandum, supra. And the Trade Court agreed that "all the record evidence shows is the manner in which the transfer price between the affiliated exporter and Importer was calculated." *United States Steel Corp.*, 578 F. Supp. 3d at 1331. It does not show that the formula price (to Steelscape) established under the Supply Agreement was lowered to account for BSA's payment of dumping duties.

**D.    Commerce Correctly Found That The "Mill Price" That AIS Charged BSA Was For the Purpose of Determining Entered Value**

The record shows, of course, that exporter AIS did not charge importer BSA for the antidumping duties that BSA deposited with Customs upon entry of the merchandise. Doing so would have BSA pay the duties twice – once to Customs and once to AIS. Both Commerce and the Trade Court understood that BlueScope took this approach to comply with the definition of "entered" value as that term is defined by Customs. Commerce noted, and the Trade Court agreed, that the price that BSL charged BSA was determined by "first calculating the price to Steelscape," a duty-paid, delivered price, then deducting freight and estimated duties. The "price to Steelscape" is the formula price set forth in the agreement. In this limited sense, the price that AIS charged BSA was "based upon" the formula price. However, AIS was not "reducing" the price to BSA by this amount. Rather, it was using the freight and estimated dumping duties " to calculate entered value." Final Analysis Memo at 4, Appx4103. Based on the record, the Trade Court agreed that the purpose of the calculation was "to estimate entry value" by taking the DDP price that BSA was to charge Steelscape under the Supply Agreement and eliminating the freight and duties. *United States Steel Corp.*, 578 F. Supp. 3d at 1326.

U.S. Steel presents an elaborate but wholly counterfactual discussion of how entered value was calculated and how, U.S. Steel claims, it should have been calculated and reported. It provides a calculation of entered value "based on lowered invoice price" and a calculation "based on formula price." U.S. Steel Br. at 17. Both these calculations are contradicted by the facts of record.

First, U.S. Steel's "lowered invoice price" assumes that the price charged to BSA was "lowered" by the amount of the duties, when the facts demonstrate that the invoice price AIS charged BSA was not "lowered" from anything. The record shows no deduction from the invoice price that AIS charged BSA to account for dumping duties that BSA was to pay.

Second, U.S. Steel's "non-reimbursement" calculation "based on a formula" price is contradicted by the record. U.S. Steel claims that this calculation shows the price that would have occurred, "{i}f BlueScope charged its importer the formula price…" U.S. Steel Br. at 17. While that hypothetical is literally true, there is nothing in the record indicating that AIS was supposed to charge its *importer* "the formula price." On the contrary, as we have demonstrated, the Supply Agreement only sets the price that BSA ("its importer") was to charge the end customer Steelscape; it did *not* set forth the price that BlueScope was to charge "its importer" BSA. Commerce and the Trade Court understood the record correctly. U.S. Steel has not.

In the absence of any evidence in the record showing what price AIS was to charge BSA, AIS set its transfer price to BSA in accordance with Customs' requirements for determining "entered value," the price on which BSA was to pay dumping duties.  As U.S. Steel agrees, entered value is always what is used to determine the amount of duties the importer is required to pay.  Where a transaction is between related parties, as was the case between AIS and BSA, Commerce may use the "transaction value" of the merchandise – that is, the price charged by the exporter of the merchandise – to determine the entered (dutiable) value of the merchandise.  Customs rules require, however, that for transaction value to be used between related parties, the value must be related to market prices. BlueScope therefore began with the "formula price" set forth in the Supply Agreement to show that the transaction value of the merchandise was based on an arm's length, market-based price.  This approach meant that BSA had to begin its calculation with the formula price, a DDP price, and deduct all freight and duties to reach an entered value.  Customs has never found that BlueScope's transaction value was not a valid, market-based price.

In short, BlueScope "based" its transaction price/entered value on the Supply Agreement to prove that the price it charged to BSA was an arm's-length price.  It did not "reduce" the price to BSA in any way, as there was no agreed-upon or formula price for AIS to charge BSA.  On the contrary, AIS included in the price

to BSA all elements that would allow BSA to determine entered value properly.  It

did not charge BSA for the antidumping duties that were to be deposited by BSA,

because these were for BSA's account.  In this sense, BlueScope charged BSA

"based on" the Supply Agreement because, as Commerce correctly recognized,

BlueScope began with the DDP price t*o Steelscape* as set forth in the Supply

Agreement, demonstrating that the price to the final related party was market-

based.  The price that BSA had to declare as entered value, however, must be the

price of the merchandise packed, ready for export at the foreign price.  As this

transfer price does not include ocean freight or duties, AIS did not show those

duties in the invoice.  The invoice did show the freight that AIS had paid upon

exportation, to show what amount should be excluded in the calculation of entered

value.  Each element was detailed, allowing BSA to determine precisely the

entered value that BSA would declare on its Customs documentation.

## II.    COMMERCE PROPERLY APPLIED ITS REGULATION WHEN DETERMINING THAT BLUESCOPE HAD NOT REIMBURSED ITS IMPORTER FOR DUMPING DUTIES

Having failed to show from the record that BlueScope reimbursed its

importer directly or indirectly for the antidumping duties that BSA had deposited

with Customs, U.S. Steel attempts to construct something of a legal argument that

Commerce failed "to apply its regulation" on reimbursement of dumping duties

correctly.  Unfortunately, U.S. Steel's supposed "legal" claim rests entirely on the

same misreading of the facts that we have detailed above and is entirely inconsistent with Commerce's past treatment of this type of allegation in past proceedings.  Given this particular record, Commerce properly applied its own regulation.

U.S. Steel mistakenly argues at some length that the finding of no reimbursement results in an overly narrow reading of Commerce's regulation, because the regulation permits a showing of reimbursement based on a lowered invoice price.  U.S. Steel Br. at 22-23.  Commerce and the Trade Court, however, did not conclude that the regulation prohibits Commerce from ever finding reimbursement based on a lowered invoice price.  Indeed, Commerce agreed that its regulation is broad enough to encompass indirectly, that is, if the exporter actually indirectly "reimburses" the importer for dumping duties.  As the Trade Court put it, "it does not appear that Commerce interpreted the regulation in a way that would necessarily exclude what Plaintiffs have called "indirect reimbursement," *i.e.*, the lowering of an invoice price.''  *United States Steel Corp.*, 578 F. Supp. 3d at 1332. The argument of an overly narrow reading of the regulation is just wrong.

What Commerce and the Trade Court both concluded, however, was that there was no <u>evidence</u> on this specific record to establish that AIS actually lowered

its invoice price to BSA to account for BSA's payment of antidumping duty

deposits.  Commerce's Final Decision Memo stated:

> Despite the petitioners' claim, this information does *not* show that AIS deducted {antidumping} duties from the price that it charged to BSA; to the contrary, it simply shows the calculation of the transfer price to the U.S. customer, albeit an affiliated one."

*United States Steel Corp.*, 578 F. Supp. 3d at 1331 (quoting Final IDM at 8,

Appx0026 (emphasis in original)).  The Trade Court correctly concluded from this

statement that the evidence showed that the invoice price to BSA had not been

lowered by the amount of the duties BSA deposited.  As we have discussed at

length in Section I.B above, the evidence of record merely showed how the price *to*

*Steelscape* was calculated.  And as Commerce found, the duties paid by BSA were

passed on to Steelscape as part of the transfer price charged to it.  *Id.*

Commerce did not need to determine whether a "lowered" invoice price to

the importer could constitute reimbursement under its regulation, because there

was no evidence in the record that AIS's invoice price to BSA had been lowered as

U.S. Steel claimed.  Rather, the record evidence shows that the "formula price" set

forth in the Supply Agreement was for the price that BSA was to charge Steelscape

and that price included the amount of the antidumping duties.  And the record

demonstrates that Steelscape fully paid the formula price as set forth in the Supply

Agreement.  The price that AIS charged BSA was not the formula price; it was

merely the ex-mill price as required to determine entered value. And AIS's invoice to BSA plainly shows that it was not lowered in any way.

Consequently, given that there was no evidence that AIS had lowered its invoice price to BSA, all of U.S. Steel's arguments about whether a lowered invoice price can or should be used to determine "indirect" reimbursement become irrelevant. It is simply not an issue when all the record evidence shows that the invoice price was *not* lowered in this case. U.S. Steel's attempt to construct a legal argument that Commerce and the Trade Court applied an improperly narrow reading of Commerce's regulation fail as a matter of fact -- the record demonstrates that the "indirect" reimbursement claimed by U.S. Steel simply did not exist.

Moreover, U.S. Steel's argument ignores important past Commerce precedent. In numerous cases, Commerce has determined that the reimbursement rules do not apply in that situation in which the respondent is acting as both exporter and importer. Commerce has stated that "a party cannot 'reimburse' itself when acting as its own importer of record." *Large Diameter Welded Pipe from Canada: Preliminary Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2020*, 87 Fed. Reg. 6,497 (Feb. 4, 2022) and accompanying Issues and Decision Memorandum at 22 (*citing Certain Frozen Warmwater Shrimp From Thailand: Final Results of Antidumping Duty*

*Administrative Review, Partial Rescission of Review, and Revocation of Order (in Part); 2011-2012*, 78 Fed. Reg. 42,497 (July 16, 2013) and accompanying Issues and Decision Memorandum at 41) (emphasis supplied); *see also Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 Fed. Reg. 40,848 (July 11, 2012) and accompanying Issues and Decision Memorandum at 22.

More generally, Commerce has always been sensitive to the particular situation of alleged reimbursement among affiliated parties. When adopting the regulatory test, Commerce observed that "it is not justifiable to presume that the existence of an affiliation will result in reimbursement or that an affiliated U.S. importer, because of its affiliation, is more likely to file a false certification." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,355 (May 19, 1997). In other words, Commerce requires specific evidence of reimbursement, not presumptions or suspicions.

Further, the Trade Court has explained that "{e}vidence of below-cost transfer pricing between related parties is not in itself evidence of reimbursement of antidumping duties." *Torrington Co. v. United States*, 881 F. Supp. 622, 632 (Ct. Int'l Trade 1995). The *Torrington* court was discussing this premise in the context of a highly analogous factual situation. In the proceeding below a domestic interested party had alleged that "{i}n instances where potential

antidumping duty reimbursement has occurred between the parent and subsidiary via the manipulation of transfer prices and where preliminary dumping margins have been found" Commerce should make a price deduction. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews*, 57 Fed. Reg. 28,360, 28,370 (June 24, 1992).  Commerce rejected this argument and instead found that:

> the Department does not make adjustments to U.S. price based upon intracompany transfers of any kind. Indeed, the Department has a long-standing practice of denying adjustments for intracorporate payments on the grounds that, because affiliated companies are a single entity for the purposes of the antidumping law, payments from a parent company to its subsidiary  are not expenses to the consolidated corporation as a whole.

*Torrington Co,* 881 F. Supp. at 631-632 (quoting Commerce's final results).  The Trade Court sustained those results on that basis.  In other words, just because a price between affiliated parties may seem low, that does not support a conclusion of reimbursement.

U.S. Steel claims that the purpose of the antidumping duty law would be frustrated by Commerce's decision here, because "antidumping duties are meant to raise the price of the merchandise to the importer to remedy dumping."  U.S. Steel Br. at 18.  This claim misstates or misapprehends the purpose of the reimbursement regulation.  The regulation does not seek to "raise the price of the merchandise to the importer" in any and all circumstances.  Rather, the regulation seeks to ensure

the impact of duties is fully borne in the U.S. market, whether by the immediate importer or its U.S. customer.  *See Apex Exps. v. United States*, 777 F.3d 1373, 1381 (Fed. Cir. 2015) ("both companies are paying antidumping duties as an importer. These duties, in turn, discourage them from charging a harmfully low price to U.S. buyers. There is no need to impose dumping remedies twice—the rationale of the reimbursement regulation does not apply here.").  That much is clear from the Trade Court decision cited by U.S. Steel, which focuses on a "viable remedy" meaning a remedy at the point of competition.  *See Hoogovens Staal BV. United States*, 4 F. Supp. 2d 1213, 1217 (Ct. Int'l Trade 1998) ("US producers would remain at a competitive disadvantage without the benefit of a viable remedy for the injury caused by the dumped imports.").  The transfer price between related parties is not the point of competition.  Once again, BSA, the importer, paid the antidumping duties, and passed them on entirely to its customer Steelscape.  The purpose of the regulation was fully effected.

## CONCLUSION

Commerce properly concluded that the evidentiary record did not demonstrate direct or indirect reimbursement of antidumping duties paid by BSA. Commerce also correctly held that its regulation requires some evidence of reimbursement, whether direct or indirect.  In the absence of any evidence of direct or indirect reimbursement, Commerce reasonably determined that the regulation did not apply in this case.  For these reasons, this Court should affirm the Trade Court's decision that found no fault with Commerce's final antidumping review determination.

Respectfully submitted,

/s/  Daniel L. Porter

Daniel L. Porter
Christopher Dunn
James P. Durling
James C. Beaty

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, DC  20006
(202) 452-7373

*Counsel for BlueScope*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-2078

**Short Case Caption:** United States Steel Corporation v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[☑] the filing has been prepared using a proportionally-spaced typeface and includes __6,436__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __1/25/2023__

Signature: __/s/ Daniel L. Porter__

Name: __Daniel L. Porter__