**2022-2078**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**UNITED STATES STEEL CORPORATION,**
*Plaintiff-Appellant*

**NUCOR CORPORATION,**
*Plaintiff*

**v.**

**UNITED STATES, BLUESCOPE STEEL (AIS) PTY LTD., BLUESCOPE STEEL LTD, BLUESCOPE STEEL AMERICAS, INC.,**
*Defendants-Appellees.*

---

Appeal from United States Court of International Trade
Court No. 1:20-cv-03815-RKE, Judge Richard K. Eaton

---

**NONCONFIDENTIAL RESPONSE BRIEF OF
DEFENDANT-APPELLEE UNITED STATES**

---

BRIAN N. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
SPENCER NEFF
Attorney
Office of the Chief Counsel

KELLY A. KRYSTYNIAK
Trial Attorney
Commercial Litigation Branch
Civil Division

  For Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

January 27, 2023

U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................................1

STATEMENT OF CONFIDENTIAL INFORMATION .....................................2

STATEMENT OF THE ISSUE.............................................................................3

STATEMENT OF THE FACTS ...........................................................................3

    I.     Legal Framework For Antidumping Duty Proceedings..........................2

    II.    Administrative And Trial Court Proceedings..........................................6

SUMMARY OF THE ARGUMENT ...................................................................12

ARGUMENT .......................................................................................................13

    I.     Standard Of Review ..............................................................................13

    II.    Commerce's Determination That No Reimbursement Occurred
           Between BlueScope And Its U.S. Affiliate Is Supported By
           Substantial Evidence ............................................................................14

          A.   U.S. Steel's Assertions Hinge On A Fundamental Misreading
               Of The Supply Agreement............................................................14

          B.   Commerce Correctly Applied Its Reimbursement Regulation.....23

CONCLUSION ...................................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Apex Exps. v. United States,*
   777 F.3d 1373 (Fed. Cir. 2015)............................................................ 3, 22

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984)...............................................................12

*Auer v. Robbins,*
   519 U.S. 452 (1997).................................................................................27

*Bausch & Lomb v. United States,*
   148 F.3d 1363 (Fed. Cir. 1998)...............................................................28

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938).................................................................................12

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966).................................................................................12

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ................................................................................25

*Hoogovens Staal BV v. United States,*
   4 F. Supp. 2d 1213 (1998) ................................................................... 3, 22

*Shandong Huarong Mach. Co. v. United States,*
   435 F. Supp. 2d 1261 ..............................................................................25

*Torrington Co. v. United States,*
   881 F. Supp. 622 (Ct. Int'l Trade 1995)......................................... *passim*

*U.S. Steel Corp. v. United States,*
   621 F.3d 1351 (Fed. Cir. 2010)..................................................................2

*U.S. Steel Corp. v. United States,*
   578 F. Supp. 3d 1323 (Ct. Int'l Trade 2022)................................. *passim*

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013).................................................... 11, 12

*United States v. Fed. Ins. Co.*,
   805 F.2d 1012 (Fed. Cir. 1986)........................................................15

*United Steel & Fasteners, Inc. v. United States*,
   947 F.3d 794 (Fed. Cir. 2020)..........................................................27

**Statutes**

19 U.S.C. § 1516a(b) ...........................................................................11

19 U.S.C. § 1673 ..................................................................................1

19 U.S.C. § 1675(a) ..............................................................................1

19 U.S.C. § 1677(35) ............................................................................2

19 U.S.C. § 1677a(b) ............................................................................2

**Rules**

Fed. R. App. P. 32(a) ..........................................................................31

**Regulations**

19 C.F.R. § 351.402(a)...........................................................................2

19 C.F.R. § 351.402(f) ................................................................. *passim*

**Federal Register**

*Antidumping Duties*,
   45 Fed. Reg. 8,182 (Dep't of Commerce, 1980) ..................................28

*Antidumping Duties; Countervailing Duties*,
   62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997)............................ 3, 22

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof
   From France, et al.*,
   62 Fed. Reg. 54,043 (Dep't of Commerce Oct. 17, 1997) .......................... *passim*

*Certain Hot-Rolled Steel Flat Products From Australia*,
   84 Fed. Reg. 68,876 (Dep't of Commerce Dec. 17, 2019)....................................7

*Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the
 Republic of Korea, the Netherlands, the Republic of Turkey, and the United
 Kingdom: Amended Final Affirmative Antidumping Determinations for Australia,
 the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*,
   81 Fed. Reg. 67,962 (Dep't of Commerce Oct. 3, 2016) ....................................4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   83 Fed. Reg. 63,615 (Dep't of Commerce, Dec. 11, 2018)..................................5

*Porcelain-on-Steel Cookware from Mexico*,
   65 Fed. Reg. 30,068 (Dep't of Commerce May 10, 2000)..................................29

## Other Authorities

Incoterms Rules 2010,
   available at: https://iccwbo.org/resources-for-business/incoterms-
   rules/incoterms-rules-2010 (last accessed January 24, 2023).....................  15, 18

Ruth F. Sturm, Customs Laws and Administration § 51.7 at 57 (1995) ................28

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that previously were before this Court or any other appellate court under the same or similar title.  Defendant-appellee's counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by the Court's decision in this appeal.

## STATEMENT OF CONFIDENTIAL INFORMATION

Pursuant to Federal Circuit Rule 28(d), Defendant–Appellee, the United States, state that this Response Brief contains certain confidential business proprietary information protected by Administrative Protective Order in the underlying agency proceeding.  Such confidential business proprietary information (BPI) consists of information contained in business proprietary documents and data provided by defendant-appellees BlueScope to the Department of Commerce. During the underlying proceeding, Commerce accepted the BPI designation and accorded confidential treatment to the BPI.

Accordingly, confidential information has been redacted from the following pages of the non-confidential version of this Response Brief: 17, 18, 19, and 20.

Finally, pursuant to Federal Rule of Appellate Procedure 25(c)(2) and with U.S. Steel's counsel's written consent, and the BlueScope counsel's written consent, the confidential version of this Response Brief has been served via secured electronic delivery.

## STATEMENT OF THE ISSUE

Whether the Department of Commerce's determination that an Australian producer/exporter of hot-rolled steel did not reimburse its affiliated U.S. importer for antidumping duties is supported by substantial evidence and in accordance with law where the transfer price between the Australian exporter and U.S. importer deducted antidumping duties, but the U.S. importer ultimately paid applicable duties and passed that cost on to its affiliated customer in the United States.

## STATEMENT OF THE FACTS

### I.    Legal Framework For Antidumping Duty Proceedings

The antidumping statute is a remedial law authorizing Commerce to provide relief to domestic manufacturers by imposing duties on imports of comparable products that are sold in the United States at less than fair value when there is also injury to the domestic industry.  19 U.S.C. § 1673.  Once Commerce investigates a dumping allegation and issues an order, the agency, if requested, conducts annual reviews to determine the amount of dumping and duties owed for the review period.  19 U.S.C. §§ 1675(a)(1)(B), (2)(A).

To do so, Commerce calculates a "dumping margin" for each entry of merchandise subject to review.  19 U.S.C. § 1675(a)(2)(A)(ii).  A dumping margin is the amount by which the "normal value" (home market price) exceeds the United States export price for the merchandise.  *U.S. Steel Corp. v. United States*,

3

621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)). Where U.S. customers are affiliated with an exporting producer, Commerce will use a constructed export price, which is the price at which merchandise is first sold to a non-affiliated purchaser, with deductions made to account for additional costs and expenses incurred by U.S. affiliates. 19 U.S.C. § 1677a(b), (d)(1). In the administrative review on appeal, all of the Australian exporter's U.S. sales were made to its U.S. affiliate; BlueScope thus reported its sales on a constructed export price basis[1] based on its U.S. affiliate's ultimate sales to unaffiliated customers in the United States. Appx10.

Generally, a lower export or constructed export price leads to a greater dumping margin, increasing the amount of duties owed by an importer of dumped goods. Commerce's regulations provide for certain circumstances under which it will adjust the constructed export price. *See* 19 C.F.R. § 351.402(a). Relevant here, if Commerce finds that an exporter reimburses an importer for antidumping duties owed, it will deduct the amount of the reimbursed duty from the constructed export price, resulting in lower constructed export price and thus a higher dumping margin. 19 C.F.R. § 351.402(f)(1)(i) ("In calculating the export price (or the constructed export price), the Secretary will deduct the amount of any antidumping

---

[1] Because the sales at issue here were reported on a constructed export price basis, our brief refers only to constructed export price when discussing legal principles applicable to both export and constructed export price.

4

duty or countervailing duty which the exporter or producer…Paid directly on behalf of the importer; or …Reimbursed to the importer.")

Importers must certify that they did not receive reimbursement for antidumping duties, and Commerce may presume from an importer's failure to file a certification that reimbursement occurred.  19 C.F.R. § 351.402(f)(3).  The preamble to the final rule establishing Commerce's regulations explains that the certification requirement applies regardless of the affiliation status of the importer. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, at 27,355 (Dep't of Commerce May 19, 1997) (*Preamble*).

However, even where a reimbursement certification is provided, Commerce may nevertheless find that the reimbursement regulation is applicable and adjust the constructed export price.  This is because the reimbursement regulation is designed "to preserve the remedy provided under the antidumping and countervailing duty laws" by ensuring that those duties are felt by the entity actually importing the foreign merchandise.  *United States Steel Corp. v. United States*, 578 F. Supp. 3d 1323, 1329 (Ct. Int'l Trade 2022) (Appx11), quoting *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1217 (1998); *see also Apex Exps. v. United States*, 777 F.3d 1373, 1381 (Fed. Cir. 2015) ("both companies are paying antidumping duties as an importer.  These duties, in turn, discourage them from charging a harmfully low price to U.S. buyers.  There is no

need to impose dumping remedies twice—the rationale of the reimbursement

regulation does not apply here.)

In the case of affiliated parties – as here – the "antidumping statute and

regulations make no distinction in the calculation of {U.S. Price} between costs

incurred by a foreign parent company and those incurred by its U.S. subsidiary."

Appx26 (quoting *Torrington Co. v. United States*, 881 F. Supp. 622, 631 (Ct. Int'l

Trade 1995)).  For the purposes of the reimbursement regulation, Commerce thus

"does not make adjustments to U.S. price based upon intracompany transfers of

any kind" unless record evidence indicates "a link between intracorporate transfers

and the reimbursement of antidumping duties{.}" *Torrington*, 881 F. Supp. at 631-

632.  As the trial court summarized Commerce's approach, "to show

reimbursement, more evidence is required than the lowering of the invoice price

among affiliates." *United States Steel Corp.*, 578 F. Supp. 3d at 1329, Appx8.

## II.    <u>Administrative And Trial Court Proceedings</u>

An antidumping duty order covering hot-rolled steel from Australia is in

effect.  *Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the*

*Republic of Korea, the Netherlands, the Republic of Turkey, and the United*

*Kingdom: Amended Final Affirmative Antidumping Determinations for Australia,*

*the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*,

81 Fed. Reg. 67,962 (Dep't of Commerce Oct. 3, 2016).  On December 11, 2018,

Commerce initiated an administrative review of its order, covering hot-rolled steel

from Australia exported to the U.S. from October 1, 2017 through September 30,

2018.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*,

83 Fed. Reg. 63,615 (Dep't of Commerce, Dec. 11, 2018).

The review covered BlueScope, an Australian producer of hot-rolled steel.

*Id.*  Commerce considers BlueScope to be a single entity, although it is comprised

of three affiliated producers – BlueScope Steel (AIS) Pty Ltd (AIS), BlueScope

Steel Limited, and BlueScope Steel Distribution.  Appx37.  BlueScope is also the

parent company of BlueScope Steel Americas LLC (BSA) and Steelscape LLC

(Steelscape).  Appx64 (BlueScope Sec. A Quest. Resp.).

BSA is a United States importer and Steelscape is a United States company

that further processes and sells hot-rolled steel into coated and galvanized steel.

*Id.*[2]  Every sale made by BlueScope during the period of review was exported from

Australia by AIS to BSA in the United States.  *Id.*  BSA then resold a majority of

its imports to Steelscape in a "back-to-back" transaction, at which point Steelscape

would further manufacture the merchandise.  *Id.*  BSA resold a small amount of its

imports to unaffiliated purchasers.  *Id.*

---

[2] Defendant-Appellee BlueScope's brief contains a chart demonstrating the
relationship between these entities.  *See* ECF No. 27 at 8.

BlueScope reported the pricing methodology that it employs to set prices between AIS, BSA, and Steelscape.  Appx2065-2108; *United States Steel Corp.*, 578 F. Supp. at 1325-26.  A supply agreement sets the price charged to Steelscape for the merchandise according to a formula using two published price indices for hot-rolled steel.  Article 5.1 of the Supply Agreement uses this formula to determine the price of the purchase order that Steelscape submits to BSA.  Appx2078.  Article 3.5 of the Supply Agreement provides that "Steelscape will submit two {purchase orders} to BSA for the total amount of {hot-rolled coil} in the Steelscape Order for each supply month…" Appx2077.  Article 6.1 of the Agreement also contemplates that "BSA will provide to Steelscape" steel at a price that is a delivered, duty-paid price, meaning a price that includes both the duties and the cost of delivering the merchandise to Steelscape.  Appx2079; Appx5 n.2; *United States Steel Corp.*, 578 F. Supp. 3d at 1325 n 2 (setting forth text of applicable contract term).

The supply agreement does not set forth the "transfer price" between AIS and BSA, or the price that AIS will charge BSA when it ships steel from Australia.  BlueScope thus also explained its methodology for setting that transfer price, based on the characteristics of a given product.  Appx2135-2146.  BlueScope explained that it deducts estimated antidumping duties and freight charges from the ultimate Steelscape price to arrive at a transfer price for BSA.  Appx36.  BSA, as the

importer of record, then pays duties on this price and sells the subject merchandise to Steelscape at a price including an amount for antidumping duties paid by BSA. *Id.*

BlueScope reported to Commerce that AIS deducted export duties from the price that it charged to BSA, but that BSA – per the terms of the supply agreement – paid those duties at importation and passed that cost on to Steelscape. *Id.* BlueScope further certified, as required by regulation, that it did not otherwise reimburse AIS for the duties that it paid. Appx25. In addition to this certification, BlueScope provided multiple "sales traces," including documentation demonstrating that BSA actually paid duties on the entries and passed that cost on to Steelscape. Appx149-332.

Prior to Commerce's preliminary results, U.S. Steel alleged that BlueScope reimbursed BSA, its affiliated importer, for antidumping duties by deducting the estimated duty amount from its transfer price. Appx48. In its preliminary determination, Commerce found that its reimbursement regulation did not apply. *Certain Hot-Rolled Steel Flat Products From Australia*, 84 Fed. Reg. 68,876 (Dep't of Commerce Dec. 17, 2019) (preliminary results), and accompanying Issues and Decision Memorandum (PDM). Appx48. Commerce explained that it found no record evidence to support U.S. Steel's assertion that AIS had reimbursed BSA for import duties and, further, BSA had certified that it – rather than AIS –

9

paid the duties, and was not reimbursed by AIS. *Id.* Commerce thus found that record evidence did not support a finding of reimbursement. *Id.*; *see also* Appx3127.

Commerce continued to determine that reimbursement did not occur in its final results. Appx25. Commerce based its finding on the same record evidence indicating that the supply agreement set the price to Steelscape, and that – when it came to the "transfer price" to BSA – BSA had actually paid antidumping duties on the entered value of merchandise, and certified that it was not reimbursed for payment of those duties. Appx25; Appx2065-2087. Commerce thus continued to disagree with U.S. Steel's contention that BlueScope's transfer price to its affiliated importer was tantamount to reimbursement, finding that record evidence "demonstrates that BSA paid {antidumping} duties on its imports of subject merchandise, and it passed these duties on to Steelscape as part of the transfer price charged to it." Appx26.

After Commerce published its final results, U.S. Steel filed a complaint in the United States Court of International Trade (trial court) challenging Commerce's determination that reimbursement did not occur. The trial court found that Commerce's determination was supported by substantial evidence and in accordance with law. *United States Steel Corp.* v. United States, 578 F. Supp.

3d 1323, Appx2-18.  Specifically, the trial court considered the parties' arguments and the record evidence, concluding that:

> the facts show{} a single entity took the final price paid by its last-in-line affiliate, deducted from that price an amount equal to the duties paid at the time of entry, and used the result as the basis for the price charged to the Importer.  Thus, the entered price, as is universally the case, did not contain duties which were paid at entry by the Importer.  The Importer (as an affiliate) paid the duties and added them to the price charged to the last-in-line affiliate purchaser.

*Id.* at 1331; Appx15.

The trial court thus found that AIS's "deduction of estimated antidumping duties from" BSA's "invoice price, on its own, is unremarkable when viewed in the context of the record" because "{t}ogether with the non-reimbursement evidence in the form of the certificate filed by {BSA}, and evidence that {BSA}paid duties owed on the subject steel…it was not unreasonable for Commerce to find that the reimbursement regulation did not apply here." *Id.*

The trial court rejected U.S. Steel's argument that reimbursement had indeed occurred, finding U.S. Steel "failed to demonstrate that the actual payments and prices charged were anything other than those in a garden variety transaction among an exporter, an importer, and an unaffiliated purchaser" and "failed to establish, with evidence, any link between" the

11

affiliates' calculated transfer price (*i.e.* the price from AIS to BSA) "and the

alleged reimbursement of duties." *Id.* at 1331; Appx15-16.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce's determination that BlueScope did not reimburse its affiliated

U.S. importer for antidumping duties is supported by substantial evidence, in

accordance with law, and should not be disturbed.  Substantial record evidence

establishes that BSA paid antidumping duties on its imports of hot-rolled coil from

Australia, and passed those duties onto its U.S. customer.  The intent of the

antidumping duty laws is satisfied here.

U.S. Steel's assertions are based entirely on a misreading of the supply

agreement, claiming that that document sets the prices between the Australian

exporter and the United States importer.  But the supply agreement actually sets

the price that the U.S. importer will charge the final affiliated customer,

Steelscape; it is silent as to the transfer price between the Australian exporter and

the United States importer.  Moreover, BlueScope explained how the transfer price

is set, including that the Australian entity deducts the costs of antidumping duties

that the United States importer will ultimately pay.  On top of this, BlueScope

provided evidence demonstrating that the United States importer *actually did* pay

the applicable duties and passed that cost on to its affiliated customer:  invoices

from the customs broker charging BSA for the duties, a bank transfer showing payment by BSA to the customs broker for the duties, and an invoice showing a duty-inclusive price passed on to Steelscape.

Moreover, Commerce's application of the reimbursement regulation is consistent with the plain language of that regulation and thus in accordance with law. The reimbursement regulation directs Commerce to account for "the amount of any antidumping duty or countervailing duty which the exporter or producer … reimbursed to the importer," or, add the amount of any reimbursed antidumping duties to the constructed export price. 19 C.F.R. § 351.402(f)(1). Commerce's practice is to require "direct evidence" of reimbursement in the case of affiliated entities, and Commerce's conclusion that no reimbursement occurred here is supported by substantial record evidence: the supply agreement, the transfer price methodology, and the sales traces. Commerce's determination that BlueScope's transfer price to its U.S. affiliate is not indicative of reimbursement is consistent with law, supported by substantial evidence, and should be affirmed.

## **ARGUMENT**

## I.    **Standard Of Review**

This Court will uphold Commerce's determination that no reimbursement occurred, unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013)

(quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

With respect to legal and factual issues in Commerce's determination, this Court applies "the same standard used by the trial court in its consideration of Commerce's determination."  *Union Steel*, 713 F.3d at 1106.  Thus, while this Court recognizes that the Court of International Trade "has unique and specialized expertise in trade law," it reviews that court's decision *de novo.  Id.*

## II.    Commerce's Determination That No Reimbursement Occurred Between BlueScope And Its U.S. Affiliate Is Supported By Substantial Evidence

### C.    U.S. Steel's Assertions Hinge On A Fundamental Misreading Of The Supply Agreement

U.S. Steel's central allegation is that, because the "invoice" price between AIS and BSA did not include antidumping duties, reimbursement occurred notwithstanding record evidence indicating that BSA *actually paid* antidumping duties and passed that cost on to its United States customer.  Misreading the supply

14

agreement and undertaking a tortured explanation of BlueScope invoices to imply that it has uncovered something both Commerce and the trial court missed (that the transfer price from AIS to BSA did not include a cost for antidumping duties), U.S. Steel alleges that BSA should have paid duties twice: in the invoice to AIS *and* upon receipt of the product in the United States. U.S. Steel's arguments confuse the issue and do not demonstrate that Commerce's determination lacks substantial evidence or is not in accordance with law.

As an initial matter, and ignoring Commerce's explanation and the trial court's well-reasoned decision, U.S. Steel continues to misread the supply agreement, repeatedly asserting that it sets the price between AIS and "the importer," or BSA. *See e.g.* App. Br. at 2 ("BlueScope failed to invoice its *importer* the price dictated by its supply agreement); 4 ("BlueScope did not charge its *importer* the formula price"); 5 ("Commerce overlooked the terms of the supply agreement governing BlueScope's transactions with its affiliated *importer*"); 6 ("The terms of BlueScope's supply agreement establish that the *importer* is to be invoiced a formula price for HRS"); 9 ("Commerce disregarded the terms of the pricing arrangement, as applicable to the *importer's* invoice price") (emphases added). But the supply agreement establishes the price that BSA will charge Steelscape – the ultimate affiliated customer – *not* the price between AIS and BSA, the importer. Appx2079. Indeed, the supply agreement makes *no mention* of how

15

the transfer price between AIS and BSA will be calculated.  Appx2065-2087.

Rather, BlueScope provided a separate explanation of how the transfer price

between those two entities is set, including "deduct{ing} estimated antidumping

duties and freight from {the price set by the supply agreement} to arrive at entered

value," with BSA then paying applicable duties at the United States border.

Appx4103.

> As the trial court explained:

>> the facts show {that} a single entity took the final price paid by
>> its last-in-line affiliate, deducted from that price an amount
>> equal to the duties paid at the time of entry, and used the result
>> as the basis for the price charged to the Importer.  Thus, the
>> entered price, as is universally the case, did not contain duties
>> which were paid at entry by the Importer.  The Importer (as an
>> affiliate) paid the duties and added them to the price charged to
>> the last-in-line affiliate purchaser.

*United States Steel Corp.*, 578 F. Supp. 3d at 1331.

With the supply agreement and the transfer methodology viewed in this

light, each of U.S. Steel's arguments fail to demonstrate any error in Commerce's

determination.  First, pursuant to regulation, Commerce presumes that importers

are being reimbursed by foreign producers for the payment of antidumping duties.

19 C.F.R. § 351.402(f)(3).  To overcome this presumption, Commerce requires

importers to certify that they were not reimbursed by the exporter for the cost of

duties .  19 C.F.R. § 351.402(f)(2).  BSA, BlueScope's American importer, did so

here, rebutting the presumption of reimbursement.  Appx25.

Second, Commerce examined the supply agreement between AIS, BSA and Steelscape, which provides that the prices BSA charges Steelscape will be set on a "delivered duty paid basis" as defined by the Incoterms 2010, meaning that the United States importer (BSA) is required "to pay any duty for both export and import and to carry out all customs formalities…" Appx2072, Appx2078; *United States Steel Corp.*, 578 F. Supp. 3d at 1325 n.2 (setting forth text of applicable Incoterms).

BlueScope also provided its transfer price methodology (*i.e.* how the price AIS will charge BSA is set), explaining that, because BSA ultimately pays antidumping duties, the transfer price from AIS to BSA excludes those duties. Appx2135-2146.

Finally, BlueScope provided Commerce with a "Sales Trace" for multiple transactions. These sales traces demonstrate that BSA *actually paid* applicable duties and passed them on to Steelscape. Appx149-332. For example, BlueScope provided a sales trace for invoice no. [                    ] for [    ] coils of hot rolled steel, including an invoice from AIS to BSA for a "free on board"[3] product value

---

[3] "Free on Board" means AIS is responsible for the product until it is delivered to the port in Australia, at which time BSA assumes responsibility. *See* Incoterms Rules 2010, available at: https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010 (last accessed January 24, 2023).

17

of [          ] (Appx248), an invoice from the customs broker[4] to BSA for

[          ] in duties owed on the [          ] value of the product (Appx241-

242), a wire transfer receipt from BSA to the customs broker paying that invoice

(Appx240), customs entry documents setting forth the duty owed on the entry

(Appx243), and an invoice from BSA to Steelscape, charging a duty-inclusive

price (Appx250).

Based on the certification, the terms of the supply agreement, and record

evidence that BSA actually paid antidumping duties upon entry of subject

merchandise, Commerce determined that reimbursement did not occur and that the

reimbursement regulation was thus not applicable.  Appx25.  This determination is

supported by substantial evidence and should not be disturbed.

Notwithstanding the substantiality of this evidence, U.S. Steel insists that

Commerce's determination is flawed.  However, the only evidence U.S. Steel

relies upon is the language of the supply agreement, repeatedly asserting that

"{t}here is no mechanism in the supply agreement that allows BlueScope to deduct

antidumping duties," from its price to BSA, and concluding that this must mean

that BSA was reimbursed for the duties by AIS.  *See e.g.* App. Br. at 6, 9.  But, as

set forth above, the supply agreement is *silent* as to the transfer price charged BSA

---

[4] A customs broker is a licensed entity that pays customs duties on behalf of
an importer.  *See United States v. Fed. Ins. Co.*, 805 F.2d 1012 (Fed. Cir. 1986).

by AIS; rather, the supply agreement simply, and logically, provides that *Steelscape* will pay a duty-inclusive price. Appx2078. And, as explained above, Steelscape did pay a duty-inclusive price.

U.S. Steel first feigns ignorance as to the true meaning of the phrase "delivery duty paid," asserting that, by virtue of including "the Incoterm for delivered duty paid" in the supply agreement, "the pricing formula is intended to set a price that includes all duties." App. Br. at 10. That much is obvious: *of course* the pricing agreement is intended to account for duties – otherwise it would overlook a major component of the ultimate price charged to Steelscape, the United States purchaser. But, again, the ultimate price to Steelscape is not the same as the transfer price from AIS to BSA, and *that price* is the one from which antidumping duties are deducted. Appx4103. And, as BlueScope demonstrated through multiple sales traces, applicable duties are paid by BSA and ultimately passed on to Steelscape, precisely as the supply agreement contemplates. Appx26.

U.S. Steel next underscores its unremarkable assertion – that the transfer price to BSA did not include the cost for duties, because BSA pays those duties when it receives the product – with reference to the sales trace provided for invoice no. [                    ], implying that it has uncovered something that both Commerce and the trial court overlooked. App. Br. at 11. But, once again, all parties agree

that the transfer price was adjusted to account for duties *that BSA would ultimately pay* when it received the product in the United States.

Indeed, as we explained *supra*, U.S. Steel provided documents for the very same invoice U.S. Steel relies upon, establishing that BSA actually paid applicable duties and passed them on to Steelscape: an invoice from AIS to BSA for a "free on board" value of the product of [                    ] (Appx248), an invoice from the customs broker to BSA for [                    ] in duties owed on the [                    ] value of the product (Appx241-242), a wire transfer receipt from BSA to the customs broker paying that invoice (Appx240), customs entry documents setting forth the duty owed on the entry (Appx243), and an invoice from BSA to Steelscape, charging a duty-inclusive price (Appx250).

U.S. Steel continues to muddy the water by arguing that BSA's payment of antidumping duties is *irrelevant* because "{t}he importer always pays the duties, so that act cannot negate reimbursement." App. Br. at 12. But, once again, U.S. Steel's argument is premised on the incorrect assumption that the supply agreement sets prices between AIS and its importer, BSA, not the ultimate customer, Steelscape. *Id.* Thus, U.S. Steel's repeated references to the "invoice" between AIS and its "importer" omitting duties that should have otherwise been included have no basis in the record: the supply agreement says that *Steelscape*

will pay a "delivery duty-paid" price, and record evidence shows that it did. Appx26.

The calculations set forth on page 17 of U.S. Steel's brief suffer from the same base misunderstanding, implying that AIS should have charged "its importer" the "formula price," *i.e.*, the formula in the supply agreement setting prices to *Steelscape.* App. Br. at 17. But, once again, the supply agreement calls for a duty-inclusive price to Steelscape, and the transfer methodology between AIS and BSA ensures that BSA pays antidumping duties – and pays them only once – as the statute intends. And, separate from the supply agreement, BlueScope described its methodology for setting the *transfer price* between AIS and BSA, explaining that that price omits duties later paid by BSA. Appx4103. Thus, the "formula" that U.S. Steel asserts BlueScope used and Commerce overlooked is, in reality, the same transfer methodology BlueScope described to Commerce and that Commerce accounted for in reaching its final determination Appx4103.

U.S. Steel similarly asserts that it is "irrelevant" that BSA paid import duties, because this has no bearing on whether BSA was ultimately reimbursed for them. App. Br. at 12-14. U.S. Steel concedes that "{t}he importer always pays the duties," but nevertheless asserts that doing so "cannot negate reimbursement" because those duties still deducted from the price that BSA was charged by AIS. App. Br. at 12. Once again, U.S. Steel's argument hinges on its misreading of the

21

supply agreement, arguing that AIS "deducted the antidumping duties to arrive at the invoice price," with the implication that the "invoice price" is that set in the supply agreement.  App. Br. at 13; *see also* App. Br. at 14 ("The invoice price, to BlueScope's importer — as distinct from the entered value — should have equaled the value calculated by the supply agreement formula which, based on BlueScope's reporting, is a duty inclusive {} price.")  But, as explained *ad nauseum* above, the supply agreement sets the price to Steelscape, not BSA.  And BlueScope explained how it calculated its transfer price to BSA, explaining that it deducts estimated duties from the price that is ultimately charged to Steelscape because BSA pays those duties at the border.  Indeed, any other arrangement would result in BSA paying duties *twice* – in the price to AIS and upon entry of the product into the United States.

U.S. Steel next argues that "BlueScope did not need to reimburse its importer for antidumping duties to avoid having cash deposits assessed on a {delivered duty paid} price" because "{h}ad BlueScope invoiced its importer the formula price, it would have been entitled to declare the included duties as a nondutiable charge and remove the duties from the transaction value to calculate entered value."  App. Br. at 16.  U.S. Steel essentially argues that BlueScope could have drafted its invoices in another manner to avoid the alleged reimbursement. But Commerce is not concerned with the *wording* on an invoice so much as the

reality of the transaction between the parties: did the United States customer

ultimately pay applicable antidumping duties, and did an overseas entity reimburse

it for those duties. In any event, what U.S. Steel asserts BlueScope should have

done is substantively what occurred here: the ultimate price to Steelscape was

calculated, estimated duties were removed from that price for the purposes of the

transfer price between AIS and BSA, and BSA paid those duties and passed them

on to Steelscape. Appx26. While it may be true that BlueScope could have chosen

to reflect those duties explicitly on an invoice to BSA – only to have BSA deduct

them as non-dutiable expenses and then turn around and pay the duties – it does

not follow that the way the transfer was *actually* structured constitutes

reimbursement.

U.S. Steel's fundamental misunderstanding of the supply agreement colors

each of its assertions, and cannot defeat Commerce's reasoned review and

explanation of record evidence. Commerce's determination that no reimbursement

occurred is supported by substantial evidence and should not be disturbed.

### D.    **Commerce Correctly Applied Its Reimbursement Regulation**

Because substantial evidence supports Commerce's conclusion that

Steelscape ultimately paid a duty-inclusive price and BSA certified (and

established by record evidence) that it was not reimbursed for the duties it paid

23

when it entered the merchandise into the United States, U.S. Steel's assertion that Commerce misapplied its reimbursement regulation must fail.

As we explained *supra,* if Commerce finds that an exporter reimburses an importer for antidumping duties owed, it will deduct the amount of the reimbursed duty from constructed export price. 19 C.F.R. § 351.402(f)(1)(i). Importers must certify that they did not receive reimbursement for antidumping duties, regardless of the affiliation status of the importer. 19 C.F.R. § 351.402(f)(3); *Preamble*, 62 Fed. Reg. 27,296, at 27,355. However, Commerce can nevertheless conclude, based on record evidence, that reimbursement occurred. *United States Steel Corp.*, 578 F. Supp. 3d at 1329 (citing *Hoogovens*, 4 F. Supp. at 1217); *see also Apex,* 777 F.3d at 1381.

In the case of affiliated parties – as here – "antidumping statute and regulations make no distinction in the calculation of {U.S. Price} between costs incurred by a foreign parent company and those incurred by its U.S. subsidiary." Appx26, quoting *Torrington*, 881 F. Supp. at 631. Thus, for the purposes of the reimbursement regulation, Commerce's practice is to "not make adjustments to U.S. price based upon intracompany transfers of any kind" unless record evidence indicates "a link between intracorporate transfers and the reimbursement of antidumping duties." *Torrington*, 881 F. Supp. at 631. As the trial court summarized Commerce's approach, "to show reimbursement, more evidence is

24

required than the lowering of the invoice price among affiliates." *United States Steel Corp.*, 578 F. Supp. 3d at 1327.

Commerce's determination here is in accordance with its regulation and past practice. First, BlueScope filed the required certification. Appx25. Moreover, Commerce did not stop at the certification, but also examined the supply agreement setting the price to Steelscape, the methodology to set the transfer price between AIS and BSA, and record evidence indicating that BSA did, in fact, pay required duties and pass those duties on to Steelscape. Appx26. Finding no evidence of reimbursement, Commerce declined to adjust the constructed export price by the amount of antidumping duties. Appx27.

Commerce explained that it does not consider transfer pricing to be evidence of reimbursement because "{t}he antidumping law does not require related parties to set up their internal transactions at arm's length, nor does it prohibit them from transferring money from one another … The antidumping statute and regulations make no distinction in the calculation of {U.S. Price} between costs incurred by a foreign parent company and those incurred by its U.S. subsidiary." Appx26. (citing *Torrington*, 881 F. Supp. at 631-632). In other words, an affiliated entity is not considered to be able to evade the impact of antidumping duties simply by lowering its price to a U.S. affiliate, and Commerce does not recognize internal pricing arrangement between affiliates to be evidence of reimbursement. Rather,

as the trial court correctly found, a finding of reimbursement between affiliated parties requires "some 'evidence showing a link between intracorporate transfers and the reimbursement of antidumping duties.'" *United States Steel Corp.*, 578 F. Supp. 3d at 1327, quoting *Torrington*, 881 F. Supp. at 631.

Here, U.S. Steel has failed to identify any record evidence of reimbursement beyond its misreading of the supply agreement. Further, U.S. Steel's reliance on a single, out-of-context phrase in an administrative determination from 1997 does not demonstrate that Commerce violated or ignored any "interpretive guidance" or established practice. App. Br. at 19-20.

The "interpretive guidance" U.S. Steel urges the Court to accept is from Commerce's final determination in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 62 Fed. Reg. 54,043, 54,076, Comment 13 (Dep't of Commerce Oct. 17, 1997) (*Antifriction Bearings*). As an initial matter, we respectfully submit that a single prior determination is not evidence of an established practice for which Commerce would be required to provide an explanation.[5] The Court of International Trade has found that "two prior determinations are not enough to constitute an agency practice that is binding

---

[5] Agencies are, of course, always "free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). U.S. Steel, however, offers no evidence of a contrary existing policy.

on Commerce," and the same is even more true in the case of *one* prior

determination, as here. *Shandong Huarong Mach. Co. v. United States*, 435 F.

Supp. 2d 1261 n. 23 (Ct. Int'l Trade 2006).

Moreover, *Antifriction Bearings* is factually distinguishable, and the

language U.S. Steel relies upon is tantamount to dicta. In that determination, a

United States producer (Torrington) argued that Commerce should apply its

reimbursement regulation where affiliated parties transfer products at a price less

than the cost of production. 62 Fed. Reg. at 54,076. The respondents argued that

Commerce should instead apply the regulation only where there is direct evidence

of reimbursement, given the inherently intermingled nature of affiliated parties. *Id.*

Commerce declined to adopt Torrington's proposed approach, explaining that,

though its reimbursement regulation can apply in "{constructed export price}

situations,[6] there must be evidence that the parent has reimbursed (*e.g.*, the

exporter directly paid the duties for the importer or the exporter lowered the

amount invoiced to the importer) its subsidiary for antidumping duties to be

assessed." *Id.* at 54,077. Commerce went on to explain its view "that

reimbursement, within the meaning of the regulation, takes place between

affiliated parties if the evidence demonstrates that the exporter directly pays

---

[6] *i.e.* the price at which merchandise is first sold to a non-affiliated
purchaser, applicable to transactions involving affiliated parties.

antidumping duties for the affiliated importer or reimburses the importer for such duties." *Id.*

The phrase that U.S. Steel casts as "interpretive guidance" and upon which its entire legal argument hangs is thus taken from the *examples* given by Commerce of circumstances that could constitute reimbursement between affiliated parties "if evidence demonstrates" as much: "(*e.g.*, the exporter directly paid the duties for the importer or the exporter lowered the amount invoiced to the importer)." App. Br. at 19. But Commerce's position in *Antifriction Bearings* and here is consistent: "there must be evidence the parent has reimbursed… its subsidiary for antidumping duties to be assessed." Appx27 (quoting *Antifriction Bearings* at 54,077). Recognizing that there may be circumstances where an invoice price indicates reimbursement, Commerce looks at all relevant evidence – here, the supply agreement, the transfer pricing methodology, and the sales traces – to determine whether there has been reimbursement such that it must adjust the export price to reflect that reimbursement.

Indeed, it is telling that U.S. Steel, on one hand, distinguishes the trial court's decision in *Torrington* because "{a}t no time has U. S. Steel alleged reimbursement because of below cost transfer pricing" (App. Br. at 20), yet insists that an agency determination from *another segment of the same proceeding* and involving the very same allegation – a below cost transfer – is binding practice that

Commerce has violated.  And, of course, U.S. Steel's assertions continue to be

premised on the flawed understanding that the supply agreement sets the price

between AIS and BSA, which is the "invoice" to which U.S. Steel alleges

*Antifriction Bearings* applies.  App. Br. at 19-21.  However, as explained *supra,*

the actual invoice resulting from the supply agreement – Steelscape's – *does*

include duty costs.  Commerce applies its reimbursement regulation based on the

specific facts on the record before it, and U.S. Steel's attempt to tease a phrase

tantamount to dicta in a twenty-five year old administrative determination into a

declaration of binding agency policy fails.

     Finally, U.S. Steel alleges that Commerce's application of its reimbursement

regulation here "conflicts with its intent and interpretation expressed at

promulgation."  App. Br. at 22.  Respectfully, U.S. Steel is wrong.

     U.S. Steel first asserts that, although Commerce amended the language of its

reimbursement regulation (originally promulgated in 1980) in 1997, "Commerce

has not expressed an intent to reverse its original intent to adjust its margin

calculation for all forms of reimbursement."  App. Br. at 23.  The current

regulation, promulgated in 1997, provides that Commerce will deduct "the amount

of any antidumping duty or countervailing duty which the exporter or producer …

{r}eimbursed to the importer" from export price or constructed export price.  19

C.F.R. § 351.402(f).  The 1980 version, on the other hand, provided a broader

definition of duties to be deducted than the current version, covering duties that are "paid by the manufacturer, producer, seller, or exporter, or which are, or will be, refunded to the importer by the manufacturer, producer, seller, or exporter, either directly or indirectly." *Antidumping Duties*, 45 Fed. Reg. 8,182, 8,206 (Dep't of Commerce 1980). Commerce's intent to alter the scope of the regulation is reflected by its *promulgation of a new regulation. See Bausch & Lomb v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) ("'A change in the language of a statute is generally construed to import a change in meaning.'") (quoting Ruth F. Sturm, Customs Laws and Administration § 51.7 at 57 (1995)). Indeed, U.S. Steel provides no legal authority to the contrary. In any event, the current regulation underscores Commerce's methodological focus on substantive, "direct evidence" of reimbursement rather than, for example, simply finding that any invoice – no matter at which stage in the chain of transactions among affiliated parties – that deducts the cost of antidumping duties is *de facto* evidence of reimbursement, as U.S. Steel urges this Court to find here.

U.S. Steel finally cites *Antifriction Bearings* and *Porcelain-on-Steel Cookware from Mexico*, 65 Fed. Reg. 30,068 (Dep't of Commerce May 10, 2000), for the proposition that "the filing of the requisite reimbursement certification does not preclude indirect reimbursement" and thus Commerce should have found reimbursement here. App. Br. at 24. But, as set forth above, Commerce did not

30

rely *solely* on the certification filed by BlueScope; rather, it based its determination on record evidence including the supply agreement, the transfer price methodology, and the sales traces.  Commerce's determination not to apply its reimbursement regulation here is supported by substantial evidence, in accordance with law, and should not be disturbed.

## **<u>CONCLUSION</u>**

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

<div style="margin-left:50%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

</div>

OF COUNSEL:

SPENCER NEFF
Attorney
Office of the Chief Counsel
  For Trade Enforcement & Compliance
U.S. Department of Commerce

/s/ Kelly A. Krystyniak
KELLY A. KRYSTYNIAK
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 307-0163

Email: kelly.a.krystyniak@usdoj.gov

Dated: January 27, 2023

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 6,458 words, excluding the portions of the brief identified in the rules.  The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/Kelly A. Krystyniak